GUSTIN *v.* MERRILL.

1. CORPORATIONS — TRANSFER OF STOCK — PURPOSE — MISREPRESENTATION—ACCOUNTING.

On a bill by a minority stockholder of a newspaper corporation against the principal stockholder for an accounting of the business and the proceeds of a sale thereof, evidence examined, and *held*, to show by a clear preponderance that a transfer of complainant's stock to defendant was not intended to transfer the title absolutely, and that a subsequent transfer to defendant was procured by fraudulent misrepresentations as to the terms of a proposed sale of the corporation's newspaper.

2. SAME—PURCHASE OF STOCK WITH COMPANY FUNDS—ACCOUNTING.

Where stock of a corporation is purchased from a stockholder with company funds it becomes treasury stock, and an accounting between the remaining stockholders should proceed on the basis of their respective holdings of the stock yet outstanding.

Appeal from Bay; Connine, J., presiding. Submitted April 5, 1906. (Docket No. 5.) Decided July 3, 1906.

Bill by Wilbert H. Gustin against Frank C. Merrill and others for an accounting. From the decree rendered, both parties appeal. Reversed, and remanded.

*Pierce & Kinnane* (*John L. Stoddard* and *Frederick K. Gustin*, of counsel), for complainant.

*T. A. E. & J. C. Weadock* (*C. L. Collins*, of counsel), for defendants.

BLAIR, J. Complainant filed his bill in this suit for an accounting between himself and the defendant Merrill of the business of the Bay City Times Company and of the proceeds of the sale thereof to defendant Booth.

Complainant alleges that on the 20th day of February, 1903, he was the owner of 400 shares of the capital stock of the company, which he was induced to transfer to defendant Merrill, to enable him to sell to Booth, by fraudulent representations that the largest price obtainable for the property was $32,000, for which amount he had given an option to Booth, whereas Booth then had an option for $65,000; that after the sale Merrill represented that he only obtained $30,000, whereas he had received $50,000; that in reliance upon these representations complainant agreed to and did accept $8,000 for his interest. Complainant also alleged by amendment to his bill of complaint that 300 shares of stock, claimed by defendant Merrill to have been purchased by him of one Bennett, were purchased with the funds of the corporation, and therefore became treasury stock, reducing the active stock to 1,500 shares, of which complainant held 400 shares and defendant Merrill 1,100. Complainant also averred that defendant had unlawfully converted to his own use funds of the company, for which he should account.

The defendant Merrill avers that he purchased complainant's stock on the 29th of October, 1901, and from that date until the sale to Booth was the sole owner of the entire stock of the corporation. This contention presents the principal issue of fact between the parties. The testi-

mony was taken before a commissioner, and the case heard by the judge of another and somewhat distant circuit. The circuit judge found that Gustin did sell his stock to Merrill in October, 1901, and was therefore not interested in the selling price; that Merrill purchased the Bennett stock with the moneys of the corporation and "must account to Mr. Gustin for such a proportion of the amount so used, viz., $2,000, as Mr. Gustin's stock then bore to the total amount of outstanding stock, with interest;" that "the accounts in evidence are not so stated that the court is able to determine what company moneys, if any, Mr. Merrill used prior to October 29, 1901, the date on which he became the owner of all the stock. Both parties will be permitted to offer proof upon this point if they wish to do so." After hearing the supplemental proofs of the parties, the court found, as follows:

"Balance due Times Company from Frank C. Merrill ___$7,480 63

Complainant Gustin's share of this balance, or four-eighteenths -------------------------------------------$1,662 36
Interest at 5 per cent. due complainant from October 29, 1901, 3 years, 5 months, 11 days -------------------- 286 54

Total amount due complainant from defendant Frank C. Merrill----------------------------------------------$1,948 90"

Decree was rendered for this amount, and both parties appealed to this court. It is agreed that prior to October 29, 1901, the complainant was the owner of 400 shares of stock. On the back of his certificate there appeared at the hearing the following indorsements:

"For value received I hereby sell, transfer, and assign to F. C. Merrill all the shares of stock within mentioned and authorize him to make the necessary transfer on the books of the company.

"Witness my hand and seal 27th Nov., 1900.
                              "W. H. GUSTIN.
"Witness: OLIVE SMITH MERRILL."

And below the assignment, in writing: "Frank C. Merrill." It is also agreed that complainant signed the

transfer of his certificate and delivered it to defendant Merrill for a temporary purpose, and that the certificate was never returned.

Merrill testified that he purchased this stock of Gustin, October 29, 1901, giving him therefor his note, payable on demand, for $4,000, with the understanding that, whenever Gustin wanted the money, Merrill's mother would get it for him.

" Where at this time was the certificate of stock which had originally been issued to Mr. Gustin for the $4,000 ?

" *A.* It was in my private drawer in the safe, where it had been after it was given to me at the time of the Bennett incident. * * * Mrs. Merrill, my wife, and my mother knew that I had purchased the McMillan stock, and I asked my wife to come to the Times Company office, which she did in the afternoon. Mrs. Merrill came to the office of the Times Company on October 29th, and I went to the safe and got that certificate and went into the editorial room. * * * She sat down at a desk, at Mr. Gustin's desk, I believe. She asked Mr. Gustin if that was his signature on the stock. He said it was. She signed her name, and I signed my name, and we went out of the editorial room; and a short time later I turned over this stock to my mother, which she held as collateral. * * * I think it was at the same time that Archie gave me his stock, that I bought of him, along in December.

" *Q.* Then you turned over to your mother his certificate and the McMillan certificate at the same time ?

" *A.* Yes, sir."

The testimony of defendant Merrill is corroborated by his wife, who testified :

" And we went into the editorial room, and I met Mr. Gustin there—sat down at the desk there. I saw his signature on this paper. I asked Mr. Gustin if that was his signature, and he said it was, and I was a witness of it.

" *Q.* Did you sign your name then ?

" *A.* I did. * * *

" *Q.* Do you remember about what time this occurred or what year ?

" *A.* The only way I can remember it, it was the fall before the baby was born, and that was in 1902, and it was the fall before that, some time in the fall. I cannot

fix the date. * * * I cannot remember anything else at all that occurred there that day."

Mr. Hamilton, the bookkeeper, also testified to a statement by Gustin, some time prior to 1903, that "he was going to dispose of his stock, or was in the course of disposing of his stock," and to a further incident—

"Of Mr. Gustin showing me a piece of paper. He was in the act then of putting the paper in his pocket as he was passing my desk, and seemed at the time to be very much pleased over something, and he said he had got—I think the expression was that he had got—$4,000 out of it.
* * *

" Q. Can you give the year ?

"A. No; I cannot.

" Q. You cannot tell whether it was 1901, 1902, or 1903, can you ?

"A. I can tell it was not 1903.

" Q. How can you tell that ?

"A. Because it was about the end of the year some time. * * * Mr. Kinnane asked me if I knew that Mr. Gustin was a stockholder—if I understood he was a stockholder.

" Q. What did you tell him ?

"A. I told him I understood that he was. * * *

" Q. The fact is that you did not at that time recall that you had had the conversation with Mr. Gustin that you have testified to here this afternoon ?

"A. Possibly I did not. * * *

" Q. Can you tell the year ?

"A. No, sir; I have no idea of the time.

" Q. You would not be certain that $4,000 is the amount he mentioned either ?

"A. No, I would not be positive.

" Q. Whether it was $4,000 or $8,000, you don't remember ?

"A. No; I do not.

" Q. It might have been $8,000 as well as $4,000 ?

"A. I have no recollection of $8,000 being mentioned.

" Q. You have no definite recollection of any other amount?

"A. No, sir; I would not say either."

Archibald McMillan testified that on October 27, 1901, at a meeting with Gustin and Merrill, or prior thereto,

and after the time he agreed to sell his stock to Merrill and Gustin, Gustin said—

"That he would like to get out of there, or words to that effect.

"*Q.* That is, in effect that he could not buy the stock, and he didn't know as he wanted to buy it, and he didn't like the way the business was running, and he wanted to get out of there himself. Is that the substance of it ?

"*A.* I think that was the substance of it."

Complainant testified that he never sold his stock to defendant Merrill, never received any $4,000 note from him, and that Mrs. Merrill never witnessed his signature to the transfer of the certificate in his presence. He denied the statements attributed to him by Hamilton, but testified that—

"The Monday morning following the closing of the deal I went through there, and told, I guess, Gerry Laing and the rest of them, and Mr. Hamilton, that I guessed I would go up now and get my money. That is the only talk I ever had with him about it. At that time I had the check in my pocket, the $8,000 check. When I say closing of the deal, I mean the sale to Booth. I was going to the Commercial Bank to get the check cashed."

His solicitors contend that the truth of his statement is established by the circumstances attending the sale to Booth, the papers executed by Merrill and Gustin for that purpose, the reports of the corporation to the secretary of State, the fact that the note for $4,000 was written upon a blank which was not in use till after the sale to Booth, and the admissions of Merrill that Gustin owned the stock at the time of that sale. Frederick Hebinger testified to a conversation with Mr. Merrill after the sale to Booth :

"Mr. Merrill told me that he received $32,000; and from that I told him I supposed Mr. Gustin must have gotten a nice little share of it, and he said, 'Yes, he said, he got a good price, and told me that his share was $8,000.' From that, then, I thought of Mr. McMillan, he being associated at the time of his death, and I asked him if the McMillan estate got about that proportion out of it, and he said, ' No, that interest had been purchased some time

before.' That is all the conversation, and that is all I know about the case."

Herbert H. Gustin, a brother of complainant, testified:

"I had a conversation with Mr. Merrill relative to the transaction. I think it was within a week after the announcement of the sale. * * * Cap and I were going down together, and I says, 'Cap, I hear you have sold out the Times Press.' He says, 'Yes.' I says, 'How much did Bert get out of it?' He says, 'He got $8,000— just double what his stock was. I done the fair thing with Bert and gave him what he wanted.' He says, 'I had an option on Bert's stock for this last two or three years, and I could have bought it at par, but I done the square thing by Bert. I gave him two for one.'"

The annual report of the corporation, showing its condition on the 1st day of April, 1902, and sworn to by Merrill, Gustin, and Clarke, April 28, 1902, stated the ownership of stock as follows:

| Stockholders' Names. | Shares of Stock Held. |
| --- | --- |
| F. C. Merrill | 1,898 |
| W. H. Gustin | 400 |
| W. A. Clarke | 1 |
| J. D. Jones | 1 |

The annual report showing the condition of the corporation January 2, 1903, sworn to by the same directors, January 20th, 1903, states the ownership of stock to be:

| Stockholders' Names. | Shares of Stock Held. |
| --- | --- |
| F. C. Merrill | 1,898 |
| W. H. Gustin | 400 |
| W. A. Clarke | 1 |
| J. D. Jones | 1 |
| Treasury stock | 800 |
| | 2,600 |

Filed January 22, 1903.

With reference to the sale to Booth, Gustin testified that he called Merrill's attention to a report that the Evening News Association contemplated coming into the newspaper field in Bay City, and suggested that Merrill call upon them, as he was going to Detroit, and take the mat-

ter up with them; that Merrill did not see Booth upon this occasion, but later on met him by appointment on February 19, 1903. On the 20th of February, 1903, upon his return from the interview with Booth, he said:

"He had sized up the situation and they were going to come in here. Cap said they could buy their paper in large quantities and buy their ink a good deal cheaper than we could, and they were in a position to give us a hot competition, and it was a question whether we could put up a fight against them—a question how long we could stand against such a corporation as the Detroit News Association. \* \* \* He said Mr. Booth wanted to know what our indebtedness was, and Mr. Merrill said he enumerated the indebtedness, which was $3,000 on the building, and $1,500 on the machinery, and $1,500 in minor accounts around town, and little outstanding bills that $1,500 would clear up, making $6,000 altogether of debts. He says Mr. Booth was willing to pay par and pay those debts. In other words, he would pay $32,000 for the paper, and we were to pay the debts out of the $32,000. \* \* \* Merrill said he had done his best to get a better price. He had talked the value of the field and plant all over with Mr. Booth, and Mr. Booth was in a position where he could judge, and he didn't care much about it. Of course, he wanted to get the entire field, and that is what he figured he was buying. The machinery and plant didn't amount to anything, but he was willing to pay $26,000 to get the paper out of the field and have a clear field here. That was the best price he could get. Finally, after the matter was gone over in that way, we both concluded it would be better for us to sell under the circumstances. \* \* \* Now, he says, he took out his pencil and commenced to figure. He says: 'You have got four-eighteenths now. When I bought that stock of Bennett's I agreed to do the square thing by you. Now I will give you 100 shares of that stock. That will make you five-eighteenths.' He figured out five-eighteenths of 26,000, and handed it back to me on a little scrap of paper about six inches long.

" *Q.* Did you see the figures that he put down on the paper?

" *A.* Yes, sir.

" *Q.* What were they?

" *A.* He divided 26,000 by 18 and multiplied by 5.

" *Q.* You saw him put down the 26,000 ?

" *A.* Yes, sir.

" *Q.* You saw him put down the 5-18 in figures ?

" *A.* Yes, sir; he figured up and says, 'Well, that comes to a little over $8,000.' I says, 'Cap, I have not figured it, but I have figured it in my mind, and I thought my share was about $7,000.' Then I said, 'There is that note of mine in the safe now, that $666 note, the company note I hold against the company.' He says, 'How much does that amount to ?' I says, 'I have not figured it up, but I think it amounts to over $800, the note and interest.' He says, 'We will call it $8,000, lump it at $8,000, for my share of the sale and the amount due on the note.' He wanted to know if that was all right. I says, 'Yes, that is fair enough.' Now, he says, 'Write me out a bill of sale of your stock.' I says: 'You have got my stock in your drawer. You can use that. My name is on the back of it.' 'No,' he says, 'I don't want to use that. I want something to show Booth that you are perfectly satisfied that this deal go through.' He says, 'I will use that in connection with the certificate, showing it is the same one.' I says, 'You dictate something to suit you, and I will write it out.' I took a pen or pencil, and I wrote out the bill of sale. He dictated it, and I wrote down what he dictated. This bill of sale referred to the old certificate of stock, the original 400 shares. We wanted to identify that certificate, and I says to Cap, 'When did I transfer that to you?' And he didn't seem to know, and I didn't seem to remember the year exactly, and he says, 'Put in there, "transferred in 1901." It will be all right.' That is the time that we supposed that we fired Bennett. I signed the bill of sale and delivered it to him at that time. He then wrote his check out on the Commercial Bank for $8,000, and told me to hold that check until he would let me know when the check was good. I suggested the advisability of our signing an agreement between ourselves, in case the deal did not go through, that I would get my stock back and he would get his check back. He says, 'Bert, I will trust you, if you will trust me.' I says: 'No, Cap; that isn't business. We ought to have something to show how we stand in this matter.' And I sat down and wrote the business out and called him to sign it. * * * I wrote it with a carbon paper underneath, so that it made a carbon duplicate copy, and I took one and he took the other. We both signed both copies. * * * He went to Detroit to close the deal on

the 4th of March, 1903.    About 4 o'clock in the afternoon, in the business office of the Times Press, he said he had been up to Mr. Weadock's office, and they had talked the matter all over, and it was decided that we would have to sell, and he was going down to sell in some way or other, and close the deal up.    He was going to be there the next day.    I says, ' Well, now, Cap, if you make the deal, send me a cipher dispatch saying that the horse is sold, and I will understand it,' and he said he would.    I shook hands with him, and we were standing at the telephone desk, and wished him success, and I went home. * * *    On the evening of March 5th I received a telegram from Mr. Merrill."

The bill of sale, the agreement, and the telegram read as follows:

"BAY CITY, MICH., Feb. 20, 1903.

"To WHOM IT MAY CONCERN: This is to certify that I have tranferred to Frank C. Merrill all my right, title, and interest in the 400 shares of stock in the Bay City Times Company, transferred to said Merrill in 1901, for a consideration of eight thousand dollars, and am perfectly satisfied in case deal with Booth of Detroit is consummated.

"W. H. GUSTIN."

"BAY CITY, MICH., Feb. 20, 1903.

"We, the undersigned, give this note to each other, and both agreeing that, in the event of deal with Booth of Detroit not being consummated within three weeks, Gustin agrees to return to Merrill his check for eight thousand dollars this day issued and Merrill agrees to return to Gustin the bill of sale of his stock dated this day.

"Our signatures:        W. H. GUSTIN.
"F. C. MERRILL."

"RECEIVED at
"811 North Water St., Bay City, Mich.
"46. DE AC ON 10 Paid.
"DETROIT, MICH., Mar. 5, '03.
"W. H. GUSTIN,
"Bay City, Mich.
"Sold horse, lower price but think will be satisfactory you.
"F. C. MERRILL.
"7 :46 P. M."

"I told him that the paper— I knew the paper was worth more money; that we ought to have got more for it. I says, 'How did you come to cut,' and he said that Mr. Booth absolutely refused to pay one cent more, and just then he pulled out a new bank book out of his pocket and held it up to me and showed an account in the Commercial Bank of $30,000, and he said, 'That is what I got.'"

Mr. Merrill's version of the transactions is as follows:

"That option, or a copy of it, has been offered in evidence in this case. The amount of it was $65,000. I did not say anything to Mr. Gustin in relation to my having given an option; as to the facts that I had given an option prior to the time it was given. I said nothing to him about the fact I was negotiating a sale of the paper to Mr. Booth until I had given the option and come home, the 20th of February. I first had a talk with Mr. Gustin in relation to the matter on February 20th, the day after the giving of the option. I think it was the next morning, in the editorial room. I went in the editorial room and I said to Mr. Gustin: 'I have given an option on the paper to Mr. Booth of the Detroit News, and if the deal goes through I want to take your note up, or my note up. He expressed surprise. The conversation occupied, I think, about five or ten minutes, because I know I went out, and then I went in the editorial room in the afternoon and saw him. I don't recollect that I told him anything about an examination of the books.

"Q. You heard this testimony in relation to your showing him a check, answering that if the deal did not go through you would have that much to blow in?

"A. Yes, sir.

"Q. Did you have such a conversation?

"A. I never said to him that we would have that much to blow in. I showed him the check, bearing out the statement that I had made that I had given Mr. Booth an option. He complained about selling his stock. In the next conversation I had with Mr. Gustin he said he thought he had made a mistake; that if he had held on he could have gotten more money. I said to him that it was a very peculiar thing; that he did not want to take any chances, he had had an opportunity to buy the McMillan stock; that he had had an opportunity to buy treasury stock before that, but that he would not take

any chances.    As long as I had taken the chances that I had taken, that I didn't see what kick he had coming.    I told him that Mr. Booth said that he was coming into Bay City, whether he bought the Times Company, or whether he started a paper; that undoubtedly there would be a fight.    I then said to him: 'I will tell you what I will do.    I will give you my check for $8,000.    You return to me my note.    If the Booth deal goes through, you can cash the check, and if it does not go through, you are to take up your certificate of stock and help me make the fight.'    I said, 'I had every reason to believe that Mr. Booth is in earnest, and that he is coming in here, and that he wants the Times property.'    Mr. Gustin agreed to the proposition, gave me back the note, and I gave him a check.    Then I said to him, 'Are you satisfied now?' He said he was perfectly.    I says, 'Then I would like to have you give me something, an agreement that you are agreeable to this transaction,' and he then sat down at his desk and wrote the paper which has been offered in evidence.    *    *    *

"Q. Did you have any part in dictating that agreement?

"A. Absolutely none.    *    *    *    After some talk, I started to go out of the editorial room, and it occurred to me that Mr. Gustin had my check for $8,000, and I thought it well to get a paper from him, and I asked him to give an agreement whereby, in case the Booth deal was not consummated, that I should receive my check back, and that he should take his stock.    *    *    *

"Q. What obligations were then outstanding?

"A. I owed $3,000 on the building; three notes, of $500 each, on the Mergenthaler linotype machines, with interest; $4,000 to A. H. McMillan; $4,000 to W. H. Gustin; $666 to Mr. Gustin for the Times Company note; the McMillan note of $666.66, although there had been a small payment made on it at that time; about $1,000 in bills; for one or two carloads of paper—the paper bills were not included in the $1,000—aggregating about $15,000.    *    *    * Mr. Gustin seemed to be very anxious, and was very anxious, that the sale should be made, and when I went to Detroit I told him if I sold the paper I would telegraph him.

"Q. At the time of the conversation, and up to that time, had you ever discussed with Mr. Gustin directly or indirectly the amount of the option?

"A. That question had never been discussed in any way.

"*Q.* Had he ever asked you?

"*A.* No, sir.

"*Q.* Did you send Mr. Gustin a message in relation to the sale of the paper?

"*A.* I did.

"*Q.* This message that has been offered in evidence here?

"*A.* I believe it is.     *     *     *

"*Q.* Why did you give him a check for $8,000?

"*A.* I wanted the man satisfied in the first place.  I wanted the man satisfied, and I wanted, as I have stated here, that in case Mr. Booth came into the field, to have Mr. Gustin there.  Mr. Gustin was a valuable man in the editorial room.  He had always been a valuable man as a reporter in Bay City.  I had a great deal of indebtedness, and after my conversation with Mr. Booth, saying he was coming into the field, and plans had been made for coming here, if he did not buy the plant, I was confident he would come in, and I thought that if Mr. Booth came and bought the Bay City Times property, and paid me what my option called for, $65,000, that by paying Bert Gustin $8,000 I was treating him all right, and it would be perfectly satisfactory, and everything would be perfectly satisfactory in every way.

"*Q.* Did you pay him this additional $4,000 because you wanted an agreement from him to stay by and make the fight with you if the paper was not sold?

"*A.* I made the proposition to him which was accepted.

"*Q.* (question read).

"*A.* That reason and the reason that I wanted the man satisfied."

The oral testimony as to the ownership of the stock is so irreconcilable that great importance must attach to the written evidence in determining where the truth lies.  The possession of the stock by Merrill regularly assigned to him by Gustin on November 27, 1900, would be quite conclusive, if it were not for Merrill's admission that such assignment was merely to enable him to vote the stock and that Gustin was the owner of the stock till October 29, 1901.  The circumstances of the sale of the stock on that day as narrated by Merrill, are somewhat unusual. The only change made in the certificate was by Mrs. Merril attaching her signature as a witness.  The transfer

still purported to have been made on November 27, 1900, and it would naturally be presumed from the face of the paper that the signature of the witness was made upon that day.   There is nothing upon the face of the paper to indicate a sale on October 29, 1901.   The signature of a witness added nothing to the validity of the oral agreement or the written transfer, and nothing whatever was said at the time to indicate that this was a new transaction. Neither would it be usual for a business man to request his wife to come to his place of business to witness such a signature when there were others at hand, and if he desired evidence of a change of the bailment to a transfer of title he would naturally have required a memorandum to that effect.   On April 28, 1902, six months after Merrill claims to have become the owner of Gustin's stock, he made affidavit to the annual report, stating that Gustin was the owner.   Again, in January, 1903, he made oath that Gustin was the owner of 400 shares.   Prior to March, 1901, the undisputed ownership of stock in the company was as follows:   Archibald McMillan, 400 shares; Wilbert H. Gustin, 400 shares; Edwin and Maria C. Bennett, 100 shares; Edwin and Maria C. Bennett, contract for stock held as treasury stock, 200 shares; Frank C. Merrill, 700 shares; treasury stock, 800 shares.   On March 15, 1901, Merrill bought the Bennett stock, and on October 28, 1901, he bought the McMillan stock.   On March 11, 1901, Merrill had transferred of his stock 1 share each to Jones and Clarke; but the certificates therefor were not removed from the stock book, and it is conceded that the two shares really belonged to Merrill.   The Bennett stock and the McMillan stock, added to the shares then owned by Merrill, made 1,400 shares, and, deducting the shares transferred to Clarke and Jones, 1,398, the precise number he swore in the reports that he owned.   These reports were made out by Mr. Merrill himself, are consistent with complainant's claim of ownership, and are inconsistent with defendant's claim.   In order to sustain his claim of purchase, we must find that he deliberately made oath

to a false statement. The circumstances should be very convincing to induce such a result. The bill of sale, except as to the date of the previous transfer, stated as 1901, is also consistent with complainant's claim, and at least unfavorable to defendant's contention. Gustin says that this paper was dictated by Merrill, who said that he wanted it "to show to Booth that you are perfectly satisfied that this deal go through," and that the year was intended to be the year of the original transfer, but through faulty recollection was written 1901, instead of 1900. Merrill denies that he dictated the bill of sale, but says it was written wholly by Gustin at his request.

" I says, ' Then I would like to have you give me something, an agreement that you are agreeable to this transaction,' and he then sat down at his desk and wrote the paper."

Disregarding the conflicting testimony of the parties, and looking to the paper itself, it is apparently a transfer of stock, previously transferred in 1901, for a consideration of $8,000. The only actual transfer of the certificate of stock that was ever made, however, so far as the paper itself shows, was in 1900, and it is agreed that that transfer was not intended to change the ownership. Moreover, the consideration for the alleged transfer of title in 1901 was $4,000. If Merrill was merely a bailee of that stock for Gustin, it was reasonable that he and Gustin should agree upon the actual transfer of ownership for $8,000. If Merrill was actually the owner of the stock, the agreement was useless and the consideration extraordinary. If he did not desire the bill of sale as an evidence of title, but merely to show that Gustin was agreeable to the transaction, it is singular that the writing was not confined to that purpose. A mistake in the recollection of the year in which a transaction took place is not so uncommon as to make the statement of the year of controlling influence. The mutual agreement signed by both parties must also be considered in construing the bill of sale. Whoever suggested the making of this agreement,

it was, confessedly, deliberately made by very intelligent men to protect their interests. In the bill of sale Gustin states that he is "perfectly satisfied in case deal with Booth of Detroit is consummated." The mutual agreement was evidently made to provide for "the event of deal with Booth of Detroit not being consummated within three weeks." In that event "Gustin agrees to return to Merrill his check for $8,000 this day issued and Merrill agrees to return to Gustin the bill of sale of his stock dated this day."

This agreement is plain and unambiguous, and clearly shows that the writing signed by Gustin just before was not intended primarily as a statement of Gustin's satisfaction with the transaction as between himself and Merrill, but was intended to be (what its terms indicate) a bill of sale of a present interest in stock for $8,000 and an expression of satisfaction with the deal with Booth. In case the satisfactory deal with Booth did not go through, the parties where to be placed in statu quo by Gustin returning the check and Merrill returning the stock. That the satisfaction expressed by Gustin was with the deal with Booth as it had been represented to him by Merrill is made manifest by Merrill's telegram of March 5, 1903: "Sold horse, lower price, but think will be satisfactory you."

Upon Merrill's theory, this telegram should have contained only the first two words, since the fact of a sale was all that concerned Gustin. Why, then, should he have further informed Gustin that he had sold at a lower price, but one which he thought would be satisfactory to him? The only reasonable answer to this question is that given in Mr. Gustin's testimony—that the deal had been fully discussed by him and Merrill, who represented not only himself but Gustin as well in making the sale, and that the price had been agreed upon on the representations of Merrill that it was the highest price obtainable. The telegram recognizes Gustin's interest, not only in the sale, but in the result of the sale, which is entirely consistent

144 MICH.—33.

with Gustin's claim that he had parted with his interest in his stock for a consideration based upon the price to be obtained for the property of the corporation, and is inconsistent with Merrill's theory that Gustin had no interest whatever in the amount to be paid.

The only remaining written evidence, if it may be so designated, is the promissory note. This note is entirely in the handwriting of Merrill, and there is nothing to connect Gustin with it, except the oral testimony of Merrill. Merrill introduced the note in evidence as the very note he gave to Gustin in payment for his stock, and which Gustin returned to him when the arrangement of February 20, 1903, was made. He stated on cross-examination that there was one chance in a thousand that it might be a copy, and explained how he might have retained a copy and destroyed the original, but maintained that, to the best of his knowledge and belief, it was the original. It is apparent that if the original bill of sale, mutual agreement, and note were left, in the first instance at his counsel's office, as claimed, obtained there for the purpose of making copies, taken away and the copies left, returned and the copies obtained for destruction, some one in the office must have known about the entire transaction. In view of the fact that complainant proved conclusively, as Merrill afterwards admitted, that the note was written upon a blank which was not in existence till after the sale of March 6, 1903, it is worthy of note that no one took the stand from his counsel's office to corroborate his explanation of the possible destruction of the original. Certainly the circumstances surrounding this piece of evidence, as disclosed by the record, do not tend to strengthen defendant's claim, but rather to cast doubt upon it. The testimony of Hamilton as to Gustin's admission that he had disposed of or was about to dispose of his stock, and his statement upon another occasion, showing a piece of paper, that he had got $4,000 out of it, is not very convincing, and is more than overcome by the testimony of Hebinger and Herbert Gustin as to Merrill's admissions

after the sale and by the documentary evidence above referred to. On the whole, we are satisfied that complainant proved by a clear preponderance of the evidence that he was the owner of 400 shares of stock on February 20, 1903, and that defendant Merrill obtained the same by fraudulent representations as to his agreement with Booth.

We agree with the circuit judge in the conclusion that the 300 shares of Bennett stock were purchased by Merrill with the money of the corporation; but we think this stock should be treated as treasury stock, and that the accounting should, therefore, be upon the basis of eleven-fifteenths of the stock being owned by Merrill and four-fifteenths by Gustin. In 1895, a resolution was adopted by the board of directors that until certain notes were paid the salaries of the editor, business manager, and others should not be increased, and an agreement to the same effect was signed by Merrill, Gustin, and the other directors. This resolution and agreement were never changed by any corporate action, and Mr. Merrill had no legal authority to increase his salary against Mr. Gustin's protest. As the accounting was limited by the circuit judge to the period prior to October 29, 1901, we do not think it desirable to determine the respective shares of the parties in advance of a full accounting.

The decree of the circuit court is reversed, and the case remanded for further proceedings in accordance with this decree. The complainant will recover costs of both courts.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.